I am back. Thank you, Your Honors. Again, may it please the Court. Counsel, could you give us just one minute? We're still shuffling a little bit of paper work here. I don't want to miss anything. Okay. We're ready. Thank you, Your Honor. Again, may it please the Court, I am Joseph Biancalli, and now representing Del Rosa Villa. This appeal poses issues that are similar in some respects to those that were raised in the plot, but with a few twists. But, again, the threshold legal question before you is how much deference is due not to the Board generally, but to this decision. But in this case, we suggest that there are some additional procedural flaws that justify reversal because each directly led to a flawed decision on the merits, which then means that it was not based on substantial evidence in the record. Counsel? I had a real problem with the cover-up of those hospital records. We have a terrific problem with that. I know you do. And I used the word cover-up intentionally. Nevertheless, it's not a criminal case, so you don't get Brady. It's not a civil case where you get discovery. What law is there that says they can't cover up the hospital records so that they get a better testimony out of their expert witness? Well, aside from fundamental fairness and what they taught us in law school about ethics and those sorts of things. I know about ñ I can't disagree with your ethical argument, but I don't know if it helps you. Well, what our argument is it directly impacts on the reliability of the fact-finding. And if it directly impacts on the reliability of the fact-finding, if it puts you in a position where you cannot be sure that this decision, in fact, was based on substantial evidence in the record taken as a whole and not based on bits and pieces. We have another case where cover-up is permitted by law and there's no discovery. A defense lawyer in a criminal case knows perfectly well that a particular witness whom he might call and who would be helpful to the defense on some matters would nevertheless have something very bad for the defense on others. So defense counsel does not call the witness. The prosecution never finds out, doesn't put on the witness, doesn't put on the evidence. That's fine. The prosecution doesn't get discovery of what the defense knows. Right. But in this case ñ Even though it affects reliability. The government is imposing a sanction. The government is taking away this facility's money, imposing a sanction, and as Your Honor suggests, it goes on the public website. Do we have any law for it or do we just have to extend the due process clause to it? There's an old decision by Judge Winner from 30 or so years ago. And those of you who remember Judge Winner, he was actually the first judge I ever appeared before back in the 70s, right in the whole being contempt. But he said there is an analogy to Brady. It's an analogy, but where the government is taking an action, the government's held to the standard where it has to at least be fair. And if the government has evidence that is exculpatory, right, Do we have a circuit court decision to that effect? We do not. I have searched high and low, and all I can think is that this is thankfully such an unusual situation. I had the same reaction that you did. This is unfair, it was misleading, and it impaired reliability. But I did not see the legal basis for doing anything about it. Unless I were to make one up. Well, I don't find a circuit court decision on the issue, and hopefully it's because it's so rare and it's never gotten to the circuit court. And that's why I make the argument that to the extent it does go to the reliability of the fact-finding, and here it does, it goes directly to the reliability of the evidence. What's your best argument that the allegedly withheld documents were material? I'm sorry? What's your best argument that they were material? They were material because the government's expert testified that she thought that the resident never should have been admitted to the facility. She was specifically asked on cross-examination, are you aware of whether there were any other psychiatric assessments of this resident between Dr. Nadella's assessment that everybody looked at and the time he was admitted? And she said, no, I'm not aware of any. And we know that there were at least three or four more after that. The ultimate one saying, we're releasing the involuntary hold, so by definition he is no longer a danger to himself or others. He is ready for discharge to a SNF, a skilled nursing facility. She never saw that. So we never had the opportunity to ask her, would this change your opinion? And the ALJ said, oh, I rely on her. She's a celebrity. She's a famous psychiatrist, appears on TV all the time. And so I'm taken with her testimony, and I rely on her. And so he never should have got there, and he should have got all these extra services, psychiatric services at the facility. The nurses should have sent him out. The nurses should have done this, should have done that. And the whole premise for that discussion, all those inferences, the whole premise for those inferences was wrong. Well, what about the day of the incident? He was so very agitated, and there's any dispute about that, right? He was so agitated he fell out of his wheelchair. He was bouncing and bounced himself right out of the wheelchair. Exactly the same behavior for which the nurses did call the physician, the physician did give an order, and then he said if the adamant is not coming down and it persists, you send him out to the hospital for an evaluation, which happened the next day. And the government says, the board says, you didn't tell the hospital what was the matter with this guy. Well, you look at the hospital admission records. It says schizophrenic, history of suicidal ideation, all the medicines he's on. You look at the hospital document itself in the emergency room, and that's where you send somebody who's having a psychiatric problem. In the emergency room, there is a box on their admission document where their triage nurse or physician, whoever it is, determines whether this person needs a full suicide evaluation, and it's checked no. Well, the hospital has an obligation to assess this guy. He is sent there because his behavior is deteriorating. He is told that he's got a history of suicidal ideation and he's schizophrenic, and the hospital says- He is told or the hospital is told? I'm sorry, the hospital is told. The hospital is told. It's on the document, and they say no. They send him back with a diagnosis that he's having a panic attack or an anxiety attack. They say give him more adamant. So it recurs a couple of days later, exactly the same thing. They give him an adamant. He falls out of the wheelchair, says he's not hurt. They call the doctor, page the doctor. The doctor doesn't call back within a couple of minutes. It's midnight or so. They page the physician again. By this time, he's calmed down enough because he's still in a wheelchair. So he's wheeling his wheelchair. He's not bouncing and so forth. He says to the nurse, I'm going out to smoke. She says, you should be in bed this time. He asks her if she has a light. She says no. He has another encounter with a nursing assistant who's doing, the record doesn't say what she's doing. As he goes out the door, he goes out the door and he hangs himself. Nothing different than what the physician, only a couple of days earlier, has been advised about. And in the interim, there has been a meeting of the Behavior Management Committee in which they document no suicidal ideation. Dr. Shin, the psychiatrist, is there. The notes of that meeting say that they have told him about sending him out. They have told him about the behaviors. They've told him about the delusions. Dr. Shin has already examined this resident at least two or three times. His examination notes are in the record. So he knows the resident. He knows the resident's history. And what does Dr. Shin do? He says, changes medication, increases medication. Dr. Shin, who by all reports in the record is an experienced psychiatrist, is not alarmed. He is the psychiatrist. He is the guy. He's not the facility's employee. He's an outside psychiatrist. I mean, the notion that the nurses at a nursing home are supposed to overrule the professional judgments of the docs at, the resident's attending physician, who says give him that, the docs at the hospital who evaluate him do a CT scan on the guy's skull to see if there's, on his brain to see if there's anything physiological going on. They diagnose panic or anxiety attacks. They send him back. Dr. Shin listens to the story, comes to the meeting, changes his medication. The notion that the nurses are supposed to overrule all of these physicians is just unacceptable. It would cause chaos in any healthcare facility, especially a nursing facility. And that is the root of our appeal. Aren't nurses allowed to overrule the doctors? Absolutely not. I would think you'd have a problem with nurses killing patients when they didn't have enough medical knowledge to overrule doctors. If a nurse has a serious problem, for example, a doctor gives an order for a medication that she knows is going to interact with another medication, or, you know, he's misplaced the decimal point. The nurse's obligation is to clarify it with the physician, right? But the nurse is not to second-guess. So they're not allowed to overrule a doctor? Right. She cannot second-guess diagnoses. You can't have a nurse saying I disagree. But that didn't happen here. Pardon? That didn't happen here. But the government says it should have. The government says notwithstanding the fact that all of these physicians had given orders, had done assessments, had done a CT scan of the brain, had made a judgment that no suicide. Part of the government's case is the facility should have obeyed the vocational nurse, should not have obeyed Dr. Shin. And they even get that wrong. The government says this licensed vocational nurse gave an order for a suicide watch. That's not what it is. Well, there's a chart. Now, what is it? It is a part of a nursing care plan, right? It says suicide watch. There is a document in the record, and I can give you the citation to it, that is the facility's suicide watch policy, right? And it specifically says suicide watch. That is one-to-one. One-to-one monitoring will be done only on a physician's order and only for as long as the physician says. But this patient wasn't getting anything like one-to-one. He was not getting one-to-one. There was never an order like that. And as a matter of fact, the government says, well, the nurses didn't even know about this suicide watch. If you look at the surveyor's notes, and again, I'll give you the citation soon, but this is all in the brief. If you look at the surveyor's notes, you will see a number of nurses told her this wasn't a suicide watch because, it wasn't a suicide watch according to my plan, because there was never a one-to-one order. What that LVN does is she assembles, she doesn't give orders, she assembles the assessments and the orders done by others, and by that point, this was eight days into the resident's stay, Dr. Shin had already assessed the resident, had not expressed any concern about suicide, and so based on his history, she put in the care plan, the nursing care plan, she said suicide watch, because of its history, she wanted to alert the nurses to be aware of the history. And that's what she told the surveyor. That is what she told the surveyor. Nevertheless, and it's in the surveyor's notes. Where do we find that? It's in the surveyor's notes, and I will tell you exactly where it is. All right. She told the surveyors that it was to remind the staff, it's in the supplemental excerpt of record that the government filed at pages 194 and 198. And if you look at pages, her survey notes start about page 171 or thereabouts, right? And if you look at it, some of the nurses are quoted as saying, for example, page 179, he was not on a suicide watch. It was not needed. If needed, he would have been ordered to be on one-to-one. There's another nurse said that on page 180, another nurse said that on page 181, another nurse said that on page 190. Counsel, who took the call from the patient's sister shortly before his death, that he was having the same kind of delusional thinking he had prior to the earlier suicide attempt? Right. I don't remember the name of the nurse, but the nurse... The nurse, wasn't it? It was a nurse, and she went in to assess the resident. The resident was calm. He denied that he had said that, right? So she said, well, I'll bring it up with Dr. Shin when we see him tomorrow. Do we know if that happened? Yes. The notes of the behavioral management conference the next day said that they discussed his delusions. And they're the same kind of delusions that he had earlier at the time he tried to commit suicide earlier? Well, I don't think we know that exactly. I'm not sure of the record. I think the record does say that. They were the very same kind of delusions about the chip in his head. Right. Well, Dr. Noble testified that that is a very typical type of a delusion that someone with schizophrenia has. So that is not a new symptom for this doctor. Okay. And, in fact... It wasn't a new symptom, and I think that's the government's point, or it's one of the points the government's making. I just want to be clear that your client's theory of the case is that he wasn't on suicide watch, and he ought not have been. That's correct. The nurses didn't have reason to be watching him particularly. That's correct. I mean, people who commit suicide do wind up in nursing homes sometimes. And, I mean, we know from just daily experience that, sadly, people, you know, attempt suicide, and they're not on one-to-one watch the rest of their life thereafter. At some point, a professional psychiatrist or mental health worker makes a judgment that they are no longer a danger to themselves. And that finding was a prerequisite to this gentleman coming into a nursing facility in the first place because this facility, like most, has an admission criterion that if you are a danger to yourself, you will not be admitted, or if you express suicidal ideation, you will be discharged to a more appropriate setting. It's not a hospital. They don't have the staff and facilities of a hospital. So the government says, well, you're just saying because he was still there, you know, so he must not have been expressing suicidal ideation. No, no, it's the other way around. Because he was not exhibiting the kinds of symptoms that would justify additional psychiatric care, whether voluntary or involuntary, he was appropriate for here. And the services that a nursing facility can provide were appropriate here. You're out of time, counsel. I'm out of time again. Thank you, Jeff. You bet. Good morning, Your Honors. May it please the Court, my name is Matt Jorgmuller. I'm the attorney for the Respondent Kathleen Sebelius. Petitioner had an obligation. Could you help me with something specific in the case? It looked to me as though the government's case depended quite heavily on the notion and it was picked up, I think, I can't remember if it was the ALJ or the board, and called the licensed vocational nurse a hero for her recommendation, which wasn't followed. It looked to me like the government's case depended very much on the proposition that the nursing home should have done what the licensed vocational nurse said, and it didn't. However, it also looked to me like Dr. Shin had taken a contrary position. He was an MD psychiatrist. Licensed vocational nurse is a person with a one- to two-year post-high school certification, not even a community college diploma. It's the lowest grade of nurse. And I just can't imagine why it would be proper to do what a licensed vocational nurse said rather than what a doctor said. Well, Your Honor, it's not the secretary's position. It's not that the facility was obligated to follow the LVN's order and that it was contrary to the psychiatrist's assessment. The nursing home is obligated to follow its own care plan based on the assessed needs of the resident. Based on a comprehensive assessment the nursing home did over the course of seven days of that resident, a number of care plan interventions were crafted. So you're saying that her care plan was contrary to what Dr. Shin said because the licensed vocational nurse wrote down what the care plan was. Not at all, Your Honor. First of all, the only time Dr. Shin assessed a resident, and this is an important point, the only time the evidence shows that Dr. Shin ever saw and assessed resident one was on May 30th. There is no indication in the record after that date that resident one was assessed by Dr. Shin. Is there anything to be done when a nurse says something's going wrong here other than calling a doctor? And they did. I mean, I'm imagining some nurse who decides to do what she imagines to be the right thing and gives them a whole lot of those brownies that we had in the last case to relax them. Well, no. I would think that a nurse who administers medication on her own would get fired. Well, Your Honor, if the care plan intervention for a suicide watch was inappropriate, as Petitioner alleges, then when the interdisciplinary team met on June 5th. How could they do a one-to-one suicide watch? I thought that the nursing home doesn't get those patients, can't do them. They don't have the padded cells. I thought that just wasn't what they did. I thought they just got people after they were off suicide watch. Well, Your Honor, first of all, the facility's own suicide, the facility's own policies and procedures, they have a policy and procedures on suicide watch, and it does contemplate one-to-one supervision. Maybe that's the problem is whether you're really taking the position that this patient was on suicide watch or not. So I guess my question more globally is, what's the government's position about how the facility failed to follow this patient's care plan? There are a number of failures. Can you just be specific? Well, first of all, there was an order for suicide watch at all times. If the order was inappropriate, then the interdisciplinary team, when they reviewed the resident's care plan, should have eliminated that intervention. Okay, so that order, you're talking about the chart note that's written in red by the nurse? Yes, suicide watch at all times. Okay, so you're saying that that's the suicide watch. Yes. Okay, what's the next way they failed to follow the care plan? Because they never communicated that plan to the staff responsible for providing care to the resident. You know, I read that in your brief. Why is it having it in his chart, not communicating that to his care providers? Because the surveyor interviewed eight different staff members, including at least four LVNs and four CNAs,  and none of them knew about resident one's recent previous suicide attempt or the fact that there was a suicide watch care plan intervention. Maybe the reason they didn't know there was a suicide care plan in effect is that there was not, because the licensed vocational nurse was just mistaken. She's the little nurse on the totem pole, and everybody else knows there's not a suicide watch. I don't think there's anything in the record that would support that inference. And going back to the change. The record says she's a licensed vocational nurse. Yes, but there's nothing to support the further inference that all the staff knew about the suicide watch. It's a little like somebody saying the court's decision is obviously wrong because the law clerk wrote a bench memo to the contrary. No, Your Honor. But the key point here is even after the care plan intervention was put in place on June 1st, putting aside for the moment the argument that it was inappropriate or unnecessary, on June 5th that resident's care plan was reviewed by the director of nursing, the nurse who wrote the care plan interventions, and two other staff members. And it was left in place as written. Now, the facility's own medical director testified. So your view is that the care plan is for a one-to-one watch, and it was not communicated or followed. No, it's up to – part of it is the care plan, and the board noted this, part of the problem with the care plan is while the board recognized that this person was at risk of suicide, the petitioner had raised the argument that, well, suicide watch doesn't really mean suicide watch. It means something else. Is the care plan for one-to-one, somebody should always be with this person, or is it not in your view? Well, the nurse, when she wrote the intervention, she told the surveyor that she envisioned it meaning visual observation. So the licensed vocational nurse said it meant that somebody should be watching this person at all times? That would be an interpretation of the visual observation. But if the obligation is on the nursing home to assess the level of supervision that resident needs and then implement that, if there's something ambiguous about what the care plan actually entitles, it's incumbent on the facility to clarify what that means. Because they're responsible for providing care for this resident. It's not CMS's obligation to come in after the fact and say, you know, this is what the suicide watch care plan meant. It's incumbent on the facility, because under the statute and under the regulations, they have to provide the care necessary for this resident based on his assessed needs. Are you really then faulting the meeting on, was it June 5th? Does your case rely on the proposition that they reached the wrong decision then? No, I highlight the June 5th meeting to make the point that if this resident did not require, if the suicide watch care plan intervention was inappropriate or unnecessary, this was the perfect opportunity for the nursing home to eliminate or clarify that intervention. By leaving it in place, the inference, the only inference is that it was appropriate and necessary. And yet there's no evidence of any heightened monitoring of this resident whatsoever. So it all still falls back on the licensed vocational nurse. She's the one who authored this care plan by making that note. Yes, and she was the one that carefully reviewed the records that, the resident's medical records, and noted, among other things, that the resident had a recent previous suicide attempt, a history of schizophrenia, suicidal ideation, delusions, hallucinations. All of these are risk factors for a suicide attempt. And the board properly held that the nurse's order for the suicide watch was objectively appropriate in this case. How is it consistent that he was on suicide watch, or at least there was a suicide concern. It's written in red ink in his chart that he had this history, which I think is uncontested at this point. How is that consistent with continuing to designate him as a safe smoker, someone who would go out in the parking lot and smoke? It's not consistent. Was that safe smoker designation in existence as of the June 5th meeting? It was. He was assessed as a safe smoker on May 22nd. Right, and that remained in place, correct? Yes. That designation never changed unless I'm missing it. No, there's no indication in the record that he was ever reassessed. Okay, so then I just have a couple more questions. What day was the day the sister phoned to report that her brother had called with these delusional thoughts? That was June 9th. The day that he died, right? It was the day before he died. The day before, forgive me, the day before. And then the other thing is, we sidetracked you a bit. A minute ago I asked, how did the nursing home fail to follow its plan of care for this patient? And you indicated that they failed to abide by this order, or whatever we're going to call it, the red ink notation in the chart regarding the suicide watch. And then you said they didn't communicate this plan of care to the care providers, at least several care providers were interviewed and were unaware of it. Were there any other acts or omissions that the government contends constitute failure to abide by the plan of care? Yes. Beginning on June 5th, the resident's mental state began to noticeably deteriorate. Okay. Petitioners discussed briefly the anxious motor restlessness, which the facility characterized as bouncing behavior, which emerged on June 5th, was present again on June 6th, June 9th, and June 10th, including less than an hour before he died. On June 7th, the facility begins to document that the resident is experiencing hallucinations and delusions every day from June 7th until June 10th, sometimes multiple times per day. These are all warning signs that this resident is destabilizing and is at an even higher risk of harm. They're all typical signs, diagnostic indicators of schizophrenia. Of uncontrolled schizophrenia, Your Honor. Well, inadequately controlled schizophrenia. Often it is inadequately controlled. But on the suicide, you know, I keep reading this, and all I can get out of this is that this licensed vocational nurse had no authority to make plans or give orders. Her job was to assemble materials. When she assembled them, she saw that the patient had been on suicide watch at Arrowhead Hospital, so she wrote that in red. The day or four days after she wrote all that, the multidisciplinary team met and left the care plan alone. It did not include a one-to-one watch. The next day he began bouncing, and the doctor at the facility raised the dosage and ordered him to go over to the emergency room at the hospital. He went to the hospital, and the hospital discharged him the next day because he had calmed down. The bouncing seems not to have been an indicator of an intent to commit suicide, just agitation. And I don't quite get why there's some plan that was violated or should have been changed to a one-to-one watch or anything beyond calling the doctor when he was still agitated that evening, which they did. There's a few points there, Your Honor. And I begin by saying that the board in previous decisions has held that a nursing home's care plan represents its assessment of what the resident, of the care and supervision that the resident needs. And the failure to follow their own care plan evidences a violation of the regulation. Now, again, yes, it was. Those are all generalizations. All you've got specifically here is at 1120, he's bouncing a lot, he crashes on the floor, so the nurse has called the doctor, he doesn't immediately answer his page, and then an hour later he seems to have calmed down and goes outside for a smoke. What should not have been allowed there? The problem started much earlier. I'm sorry, I'll address your question. The problem probably started between ages 18 and 25. That's when paranoid schizophrenia usually manifests. Well, his decompensation began, as the evidence is undisputed, by at least June 5th. And back to your question about what were some of the other facility's failures, it was a failure to respond appropriately beginning on June 5th. Now, it's true on June 6th the resident was transferred for an evaluation to St. Bernardine's Hospital in response to the bouncing, the agitation behavior. They sent him to the hospital. They did. However, they neglected to provide the hospital with two critical pieces of information. One, that there was a care plan intervention for a suicide watch, which was still in place on that date. And two, they failed to tell the hospital about it. You're talking now about the licensed vocational nurse who wrote down suicide watch, possibly suggesting that Arrowhead Hospital had had him on suicide watch before he was sent to the nursing home. Is that right? I mean, you keep saying over and over as though that made it true that he was on suicide watch at the nursing home. I'm not sure it's true. Did the facility tell St. Bernardine's that he had been at Arrowhead? There's no evidence in the record to suggest that it did. What is it you think they should have told St. Bernardine? One, that he had a recent previous suicide attempt, and two, that there was a care plan intervention for a suicide watch at all times. If the suicide watch – Is there evidence that they did not tell the hospital that he had a previous suicide attempt? They did not do so. Is there evidence that they did not do so? Yes. It's supplemental excerpt of record, page 144, and this is the resident transfer record that was filled out by a Del Rosa staff member upon one's transfer to St. Bernardine's on June 6th. It contains his reason for transfer, and it continues on the next page, the next several pages, and nowhere on the resident transfer record or the other records from St. Bernardine's does it indicate that Del Rosa informed the hospital of his previous suicide attempt or the suicide watch care plan intervention. Now, as Dr. Zayas, CMS's expert psychiatrist, testified, the hospital used a suicide screening tool called – it's an acronym called SAD Persons. So now you're talking about St. Bernardine's. Right. Okay. This is, yeah, getting back to what the facility failed to provide – To St. Bernardine, yeah. – to the admitting hospital on June 6th. Now, as Petitioner pointed out, the record from St. Bernardine's shows that a resident did not qualify for a suicide assessment. Now, that was based on the SAD Persons suicide screening tool, and as Dr. Ziv testified, I believe this testimony was not disputed, was that the – if the resident – I'm sorry. If the hospital had been told about the resident's previous recent suicide attempt and the care plan intervention for a suicide watch, he would have scored high enough on their suicide screening tool to have received a suicide assessment. However, because he did – that information was not conveyed to the hospital, he did not receive a suicide assessment because he did not score high enough on their screening tool, and he was discharged back to the nursing home later that day. But the emergence of the hallucinations and delusions followed – occurred after he returned from the hospital. So there's no way that St. Bernardine's, in doing its assessment, could have taken into account the delusions and the hallucinations that he was suffering because the facility does not document that he was – that he began suffering from those things until – – June 7th. – until June 7th. – And the sister called June 9th. – Correct. – So he was sent to St. Bernardine's for agitation. – Correct. – But there was a deterioration of his condition at that point? Was it just the bouncing? – The emergence of the agitation, what the facility calls bouncing behavior, as Dr. Zipp testified, was a sign that the resident was destabilizing. And an article from the APA, American Psychiatry Association, said that four-fifths of residents exhibit some kind of anxious or anxiety behavior in the weeks preceding their death. So that's a warning sign. The emergence of the delusions and hallucinations was a warning sign, as well as the resident's recent previous suicide attempt. Again, that is also a risk factor. – Counselor, you're considerably over time. – I'm sorry. – That's all right. If you could just – of course you can. Yes, please. – My understanding is that the government had in its possession, when the hearing before the agency was held, the hospital records – I believe it was from Arrowhead Hospital – that they would likely have affected Dr. Zipp's testimony, and that even though it had them, the government did not disclose them to its own witness, Dr. Zipp, or to the nursing home's attorneys. Is that true? And if so, what is the justification? – No, it is not true. The first time that CMS or its counsel saw the records that are contained in Petitions Exhibit 132, which are these earlier Arrowhead records, was when a petitioner provided a copy of those records to counsel for CMS immediately preceding its motion to supplement the record. And as far as the materiality of those records, they simply do not support the petitioner's allegation that they would alter Dr. Zipp's testimony in any material effect. – Thank you, Counsel. – Counsel, I think you ran down the clock, but we need to give you a couple more minutes because we asked you a lot of questions. – I appreciate that. I just want to give you a couple of citations I promised you earlier, and that is to the facility suicide threat policy, which does specifically provide for one-to-one being ordered by a physician, either the medical director or an outside physician, and that's in the supplemental administrative record starting at page 149. Again, just to emphasize, LVNs do not give orders. That was not an order. It's been characterized as an order. It's not an order. – What about counsel's position, which is that whatever it was, it was in the chart, it was written in red, and it remained after the June 5th meeting? – Right. That's right, because LVN Yoder told the surveyor that she had put it in there to keep the nurses alert to the fact that this fellow had a history of suicide. – So isn't that problematic if the nurses told the surveyor they didn't know anything about this? – Well, if you look at those interviews in Surveyor Meyer's notes, and they start in the supplemental record at 171 and go for about 20 or 25 pages, there are a couple of CNAs, nursing assistants, not licensed nurses, that said they didn't know that the resident was suicidal. But virtually every one of the licensed nurses, and there are about a half a dozen, say that he was not on a suicide watch because there was no one-to-one order. They didn't say that they didn't know that they had to look at, they didn't have to watch him, or they didn't have to be aware of suicidal ideation. – What about the nurse who watched him go out the door to smoke? Did she know? – Ooh, I wish I could remember. I would have to go back and match up the notes to see who that nurse was. – Okay. You just have a short bit left. Are there more citations you wanted to give us? – No, but again, Dr. Shin was consulted after all of the other things happened on the 6th, 7th, 8th, 9th. He was consulted on the 10th. The APA, the American Psychiatric Association guidelines that the government cites throughout its brief, of course, they're for physicians, not for nurses. And just one, I hate to belabor this point, I don't want to make a federal case, so to speak, about it, but the state surveyor testified. Her deposition transcript is not in the record, but we would be glad to add it to the record. She testified in no uncertain terms that she did provide those documents to the government and she was told by the government counsel not to give them to anyone else. Now, she may have forgotten, she may have been mistaken, but she did testify to that. I did not take that deposition, another attorney did. But we have that transcript and we can provide it to you if that's material to your decision. – You're out of time. Counsel, thank you so much for your argument and for both of your arguments today. We appreciate your help on these cases. We'll take that case will be submitted and we'll stand in recess for the day. – Thank you very much, Your Honors. Appreciate your attention. – Thank you.
judges: Sedwick, Kleinfeld, Christen